IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

**HUNTINGTON DIVISION**

CANADA PIPELINE
ACCESSORIES, CO., LTD.,

        Plaintiff/Counterclaim Defendant,

v.                                  CIVIL ACTION NO.   3:12-8448

CANALTA CONTROLS, LTD.,

        Defendant/Counterclaim Plaintiff,

v.

DALE SAWCHUK,

        Counterclaim Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending is Plaintiff's motion to dismiss Counts II, V, and VI of Defendant's counterclaims. ECF No. 15.   Also pending is a separate motion to dismiss filed by counterclaim defendant Dale Sawchuk.   ECF No. 25.   For the reasons stated below, the Court **GRANTS in part** and **DENIES in part** Plaintiff's motion, and **DENIES** Mr. Sawchuk's motion.

## I.      BACKGROUND

This is an action involving trademark infringement and related claims.   Plaintiff Canada Pipeline Accessories Co., Ltd. ("Plaintiff" or "CPA") is a Canadian corporation "dedicated to research, development and sale of cutting edge flow measurement technology for the oil and gas industries and related consulting."   Compl. ¶ 7.   Defendant Canalta Controls, Ltd. ("Defendant" or "Canalta") is also a Canadian corporation, which "provides a wide range of industrial control

and measurement equipment to the oil and gas industries throughout the United States and Canada." Countercl. ¶ 5. The parties both manufacture and sell flow conditioners, which are devices used for regulating fluid flow in pressurized pipelines. *See* Countercl. ¶ 2. The parties are direct market competitors and sell their products to energy companies throughout the United States and elsewhere, including a firm located in this district. *See* Compl. ¶ 37.

On December 3, 2012, CPA filed a five-count complaint accusing Canalta of selling "knock off" flow conditioners. CPA sells its line of flow conditioners under the "CPA 50E" and "50E" trademarks, which CPA owns. Compl. ¶¶ 12, 17, 18. According to the complaint, "CPA's flow conditioners have been subject to extensive testing and, as a result, are fully compliant with American Gas Association specifications." Compl. ¶ 16. The complaint states that CPA is the owner of "unique and distinctive trade dress in the overall non-functional appearance of its flow conditioners," including "the unique hole pattern on the face of the flow conditioner." Compl. ¶ 19. This trade dress allegedly causes consumers to "immediately identify CPA as the single source of high quality products bearing the CPA trade dress." Compl. ¶ 20.

CPA charges Canalta with trademark infringement, trade dress infringement, false advertising, false designation of origin, and unfair competition, all stemming from Canalta's activities related to the sale and manufacture of flow conditioners. The complaint alleges that Canalta markets "knock off" flow conditioners under the marks "Contour 50," "Contour 50F," and "Contour 50P." Compl. ¶ 23. At industry conferences held in Pittsburgh, Pennsylvania, in August 2012 and September 2012, Canalta allegedly displayed its flow conditioners side-by-side with CPA's products to "cause customer confusion." *See* compl. ¶¶ 24, 31, 33. According to the complaint, a Canalta employee at these conferences represented to potential customers that

Canalta's products were identical to, and performed the same as, CPA's products.  CPA alleges that Canalta further falsely represented that the Contour 50F was manufactured to the same dimensions and tolerances as the CPA 50E and that the test data for the CPA 50E is therefore valid as to the Contour 50F.  Canalta also allegedly represented that its flow conditioners comply with industry specifications, when they do not.

Canalta filed its answer on March 19, 2013, and asserted counterclaims against CPA and an additional party, Dale Sawchuk, president of CPA.  As the basis for its counterclaims, Canalta asserts that its Contour product and CPA's device have a common origin.  According to Canalta's counterclaims, the original inventor and patent holder of the flow conditioner was Elizabeth M. Laws.  Countercl. ¶ 11.  In the early 1990s, the Novacor Research and Technology Corporation instituted a program ("Novacor program") to improve upon the Laws flow conditioner to overcome certain functional flaws.  Countercl. ¶ 11.  The Novacor program conducted tests on a certain flow conditioner known as the NOVA device.  The testing conducted on the NOVA device ultimately ripened into the industry standard.  The Novacor program tested different flow conditioner designs, which were grouped into two categories based on the total surface area of the device.  Flow conditioners are perforated metal discs, with the perforations arranged in concentric circles.  The Novacor program tested different designs, each containing perforations of different sizes, and named them according to the surface area of the design.  The NOVA 60 design, for example, was a flow conditioner with an overall solidity of roughly 60 percent (*i.e.*, the perforations constituted approximately 40 percent of the surface area), and the NOVA 50 had a solidity of roughly 50 percent (*i.e.*, the perforations constituted approximately 50 percent of the surface area).  Countercl. ¶ 14.  One design emerged from the Novacor program as most "effective," and was dubbed the NOVA 50E.  Based on these allegations, Canalta argues that the

terms "50," "50E," and "60" are generic and can carry no trademark significance.   Countercl. ¶ 15.

Canalta alleges that by 2003, the NOVA 50E design became part of the industry's standard; by 2000 the American Gas Association and the American Petroleum Institute issued national standards that adopted many of the original NOVA specifications.   Countercl. ¶ 19.   The design became part of the international standard in 2003 when the design was adopted into the International Organization for Standardization's ISO 5167-1 standard.   Countercl. ¶ 20.

Canalta alleges that CPA falsely represented to the U.S. Patent and Trademark Office ("PTO") that the terms "50E" and "60" as used in its trademark applications for "CPA 50E" and "CPA 60" lacked any significance in the relevant trade or industry or as applied to the goods. According to Canalta, Elizabeth Laws licensed to CPA the exclusive rights to the American and Canadian patents for the flow conditioner design.   CPA allegedly then rebranded the NOVA 50E design as its own, and sold it under the name CPA 50E, without material modification.   In its promotional materials, CPA represents that the original NOVA testing was performed on the CPA 50E device—not the NOVA 50E device.   The original U.S. Laws patent expired on August 30, 2011, thus ending CPA's claim to the exclusive right to the NOVA 50E design.   Countercl. ¶ 29. Canalta further states that the shapes, designs, colors, and materials that make up the design of the CPA 50E are entirely utilitarian and functional, rather than protected trade dress.

Canalta states that it has had prior business dealings with CPA.   Canalta purchased CPA flow conditioner products in the past, relying on the original NOVA testing data that CPA promulgated as supporting its CPA 50E devices.   Canalta also contracted to manufacture flow conditioners for CPA, which CPA marketed based on the NOVA 50E testing data.   Once the Laws patent expired, Canalta decided to manufacture its own line of flow conditioners meeting the

NOVA 50E specifications, which it asserts are now in the public domain.   Canalta markets and sells its products as the "Contour" series.   In its marketing materials, Canalta represents that the original testing was performed on the NOVA 50E, but is still applicable to the Contour line of flow conditioners.

In response to Canalta's market entry, CPA has allegedly engaged in various unfair and deceptive practices designed to limit sales of Canalta's Contour products.   Canalta alleges that CPA has directly contacted Canalta's customers, making false and slanderous statements about the company, including that Canalta is using CPA's flow test data and that the Contour design is untested and unreliable.   CPA has also allegedly advised Canalta customers—falsely—that Canalta is fraudulently supplying "knock offs," is a company of "low integrity," and is going bankrupt.   Canalta alleges that one or more letters containing defamatory information were signed by Mr. Sawchuk and sent to third parties in this district and elsewhere.   The counterclaims state that CPA is falsely representing to the public that the hole pattern in its product design is protectable trade dress, despite evidence that the design is merely functional and thus not protectable.   Based on these factual allegations, Canalta filed six-counts in counterclaim against CPA.   Three of those are the subject of this motion to dismiss.   Count II seeks cancellation of CPA's trademark registrations because of the generic nature of "50" and "50E."   Count V charges both CPA and Sawchuk with defamation related to statements made about Canalta and/or its products.   Finally, Count VI charges CPA with tortious interference with prospective business relations.

CPA filed a motion to dismiss Counts II, V, and VI of Canalta's counterclaims, pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that Canalta failed to plead sufficient factual allegations to state plausible claims.   Mr. Sawchuk separately filed a motion to dismiss, pursuant

to Rule 12(b)(2), for lack of personal jurisdiction.   With this background in mind, the Court now turns to the parties' arguments and the applicable legal standards.   The Court will first address CPA's motion and then Mr. Sawchuk's motion.

## II.   ANALYSIS

### A.   Legal Standard

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the United States Supreme Court disavowed the "no set of facts" language found in *Conley v. Gibson*, 355 U.S. 41 (1957), which was long used to evaluate complaints subject to 12(b)(6) motions.   550 U.S. at 563.   In its place, courts must now look for "plausibility" in the complaint.   This standard requires a plaintiff to set forth the "grounds" for an "entitle[ment] to relief" that is more than mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."   *Id*. at 555 (internal quotation marks and citations omitted).   Accepting the factual allegations in the complaint as true (even when doubtful), the allegations "must be enough to raise a right to relief above the speculative level . . . ."   *Id*. (citations omitted).   If the allegations in the complaint, assuming their truth, do "not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court."   *Id*. at 558 (internal quotation marks and citations omitted).

In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court explained the requirements of Rule 8 and the "plausibility standard" in more detail.   In *Iqbal*, the Supreme Court reiterated that Rule 8 does not demand "detailed factual allegations[.]"   556 U.S. at 678 (internal quotation marks and citations omitted).   However, a mere "unadorned, the-defendant-unlawfully-harmed-me accusation" is insufficient.   *Id*.   "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to

relief that is plausible on its face.'"   *Id*. (quoting *Twombly*, 550 U.S. at 570).   Facial plausibility

exists when a claim contains "factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged."   *Id*. (citation omitted).   The Supreme

Court continued by explaining that, although factual allegations in a complaint must be accepted as

true for purposes of a motion to dismiss, this tenet does not apply to legal conclusions.   *Id*.

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice."   *Id*. (citation omitted).   Whether a plausible claim is stated in a

complaint requires a court to conduct a context-specific analysis, drawing upon the court's own

judicial experience and common sense.   *Id*. at 679.   If the court finds from its analysis that "the

well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct,

the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.'"   *Id*.

(quoting, in part, Fed. R. Civ. P. 8(a)(2)).   The Supreme Court further articulated that "a court

considering a motion to dismiss can choose to begin by identifying pleadings that, because they are

no more than conclusions, are not entitled to the assumption of truth.   While legal conclusions can

provide the framework of a complaint, they must be supported by factual allegations."   *Id*.

**B.      CPA's Motion to Dismiss**

**1.      Count II: cancellation of trademark registrations**

In Count II of its counterclaims, Canalta seeks the cancellation of three of CPA's

trademark registration numbers: (1) No. 2,994,138 ("CPA 50E"); (2) No. 3,934,642 ("50E"); and

(3) No. 3,944,407 ("CPA 50E CHANGER").   Canalta argues that these trademark registrations

are invalid and unenforceable due to the generic nature of the terms "50" and "50E" as applied to

flow conditioner devices, and also because CPA committed fraud on PTO in procuring the

registrations.

7

A defendant charged with trademark infringement may counterclaim for cancellation of that registration; the district court possesses concurrent power with the PTO, pursuant to 15 U.S.C. § 1119, to conduct such cancellation proceedings.   5 *McCarthy on Trademarks and Unfair Competition* § 30:109 (4th ed. 2013); *see also, e.g., Sweetwater Brewing Co. v. Great Am. Restaurants, Inc.*, 266 F. Supp. 2d 457, 464 n.2 (E.D. Va. 2003).   Any person with standing[1] may seek cancellation of a trademark registration

> [a]t any time if the registered mark becomes the generic name for the goods or services, or a portion thereof, for which it is registered, or is functional, or has been abandoned, or its registration was obtained fraudulently or contrary to the provisions of section 1054 of this title or of subsection (a), (b), or (c) of section 1052 of this title for a registration under this chapter . . . .

15 U.S.C. § 1064(3).

### a.    Generic trademark theory

A trademark becomes generic and unenforceable when it "ceases to identify in the public's mind the particular source of a product or service but rather identifies a class of product or service, regardless of source[.]"   *Glover v. Ampak, Inc.*, 74 F.3d 57, 59 (4th Cir. 1996) (citing 15 U.S.C. § 1064(3)).   To become generic, "the *primary* significance of the mark must be its indication of the nature or class of the product or service, rather than an indication of source."   *Id.* (citations omitted) (emphasis in original).   A party who seeks to establish that a mark has become generic must: "(1) identify the class of product or service to which use of the mark is relevant; (2) identify the relevant purchasing public of the class of product or service; and (3) prove that the primary significance of the mark to the relevant public is to identify the class of product or service to which the mark relates."   *Id.*

---

[1]  The statute confers such standing on "any person who believes that he is or will be damaged . . . as a result of a likelihood of dilution by blurring or dilution by tarnishment under section 1125(c) of this title, by the registration of a mark on the principal register[.]"   15 U.S.C. § 1064.

In this case, Canalta has sufficiently pleaded a claim for trademark cancellation under the theory that the mark is generic.   CPA argues that Canalta's factual allegations related to this claim are legal conclusions rather than specific facts.   The Court disagrees.   Canalta alleges specific facts detailing the origin of the flow conditioner product, beginning with the patent obtained by Elizabeth Laws and tracing its development through the Novacor program.   Countercl. ¶¶ 11, 14. Canalta also alleges facts explaining the meaning of the terms "50," "50E," and "60" within the industry.   Countercl. ¶ 14 (stating that "50" and "60," as used in the Novacor program tests, mean that the device has 50 percent overall surface solidity and 60 percent solidity, respectively).   In these allegations, Canalta has sufficiently pleaded (1) the relevant class of product (flow conditioners) and (2) the relevant purchasing public (those in the oil and gas industry).   Contrary to CPA's arguments, the Court finds that Canalta has also sufficiently pleaded the third element: that the primary significance of the mark to the relevant public is to identify the class of product to which the mark relates.   Canalta's allegations regarding the results of the Novacor program, countercl. ¶ 14, and the subsequent adoption of those standards by the industry, countercl. ¶¶ 13, 19, 20, are sufficient to put CPA on notice of Canalta's theory, that the Novacor program resulted in these numerical terms, which the industry as a whole associates with a class of product.

CPA argues alternatively in its reply that Canalta's claim for cancellation of the "CPA 50E" and "CPA 50E CHANGER" trademarks should be dismissed because the claim ignores the composite nature of these marks.[2]   That is, even if Canalta properly stated a claim that the mark "50E" alone is generic, it did not plead facts alleging that the phrases "CPA 50E" and "CPA 50E

---

[2] "A composite mark is one that contains some matter that is descriptive in nature—and, thus, would not alone be registerable as a trademark—used in conjunction with nondescriptive matter." *United States v. Chong Lam*, 677 F.3d 190, 199 n.7 (4th Cir. 2012) (citing *Estate of P.D. Beckwith, Inc. v. Comm'r of Patents,* 252 U.S. 538, 541 (1920) (defining "composite marks" as those which "contain both registerable and nonregisterable matter")).

CHANGER" are generic.   CPA argues that Canalta ignores the "anti-dissection" rule of trademark law, under which "conflicting composite marks are to be compared by looking at them as a whole, rather than breaking the marks into their component parts for comparison."   *United States v. Chong Lam*, 677 F.3d 190, 199 n.7 (4th Cir. 2012) (citing 4 *McCarthy on Trademarks and Unfair Competition* § 23.41 (4th ed. 2011)).   At this stage, the Court finds that Canalta's allegations support its claim that CPA's trademarks may be subject to cancellation.   Discovery in this case may reveal that the anti-dissection rule will apply to defeat Canalta's counterclaims.[3] Nonetheless, the Court finds that Canalta has adequately pleaded its claims to survive this motion to dismiss.

The issue of whether the trademark registrations are generic in this case cannot be resolved in the context of this motion to dismiss.   "It is well-established that '[w]hether a given mark is generic and therefore ineligible for trademark protection is dependent on the particular facts of the case,' and that a Rule 12(b)(6) motion 'does not resolve contests surrounding the facts [or] the merits of a claim.'"   *Va. Polytechnic Inst. & State Univ. v. Hokie Real Estate, Inc.*, No. 7:10CV00466, 2011 WL 926862, at *5 (W.D. Va. Mar. 15, 2011) (quoting *Hunt Masters, Inc. v. Landry's Seafood Rest., Inc.,* 240 F.3d 251, 254 (4th Cir. 2001) and *Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir. 1999)).   While it is true that Canalta bears the burden of ultimately proving the marks are generic, the Court's task in resolving the instant motion is simply to

---

[3]  The Court additionally observes that discovery on CPA's trademark infringement claim (Count I of the complaint) will significantly—if not completely—overlap with discovery for Canalta's counterclaim.   CPA contests Canalta's use of the number designations in its own products. Compl. ¶ 23 (alleging that "Canalta markets the knock off flow conditioners under at least the following spurious marks: Contour 50, Contour 50F and Contour 50P").   Similarly, discovery on Canalta's cancellation claim will likely overlap with that for its counterclaim for declaratory judgment, which CPA does not seek to dismiss at this stage, and the Court therefore finds it prudent to allow Canalta's claims to proceed and revisit them after discovery via a motion for summary judgment.   *See Speedmark Transp., Inc. v. Mui*, 778 F. Supp. 2d 439, 444-45 (S.D.N.Y. 2011) (Peck, M.J.).

determine whether Canalta is entitled to offer evidence in support of its trademark cancellation claim—not whether it will prevail.  *See Hidden Values, Inc. v. Wade*, No. 3:11-cv-1917, 2012 WL 1836087, at *12 (N.D. Tex. May 18, 2012).  The Court concludes that at this early stage of litigation, Canalta has properly stated a claim for trademark cancellation on the theory that the trademarks are generic, and thus the motion to dismiss will be **DENIED** on this ground.

### b.  Fraud theory

Canalta additionally claims that CPA's trademarks should be canceled because they were obtained by fraud on PTO.  To prevail on this theory, Canalta must prove that CPA "knowingly made false, material representations of fact and intended to deceive the Patent and Trademark Office."  *Resorts of Pinehurst, Inc. v. Pinehurst Nat'l Corp.*, 148 F.3d 417, 420 (4th Cir. 1998) (citations and quotations omitted).  Because this claim sounds in fraud, it is subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b), which requires a claimant to "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  The circumstances include "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby."  *Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 781 (4th Cir. 2013) (citations and quotations omitted).

Canalta specifically alleges that CPA committed fraud during its pursuit of application number 78/180,613, which resulted in registration number 2,994,138, for "CPA 50E."  Canalta argues that by this application, CPA falsely represented to PTO that the term "50E" had no significance in the relevant trade or industry as applied to the goods.  CPA disputes this allegation, arguing that, as related to this trademark application, any representations CPA made to PTO pertained to the mark "CPA 50E" and *not* the mark "50E" alone.  In other words, CPA argues that Canalta's counterclaim ignores the composite nature of the marks "CPA 50E" and

"CPA 50E CHANGER."

The Court finds that Canalta has satisfied the heightened pleading requirements of Rule 9(b) and has adequately stated a claim for trademark cancellation based on fraudulent procurement.   First, Canalta alleges that in its application for trademark registration number 2,994,138, CPA falsely represented that the term "50E" lacked any significance in the relevant trade or industry or as applied to the goods.   Countercl. ¶¶ 14, 16.   Second, Canalta alleges that this representation was material to the issuance of the trademark.   Countercl. ¶¶ 16, 45.   Finally, Canalta alleges that CPA made this false representation with intent to deceive PTO.   Countercl. ¶ 45; Fed. R. Civ. P. 9(b) ("[I]ntent . . . may be alleged generally.").   Canalta has stated the circumstances constituting the alleged fraud.    The allegations in the counterclaim are sufficiently detailed to state a proper claim for trademark cancellation.   Accordingly, CPA's motion to dismiss the claim for cancellation will be **DENIED** on this ground as well.[4]

**2.      Count V: defamation**

In Count V, Canalta charges CPA and Mr. Sawchuk with defamation, arising from statements these defendants allegedly made about Canalta's products to potential and current customers.   CPA argues that Count V should be dismissed because Canalta failed to plead

---

[4] The Court rejects CPA's argument that Exhibit A to Canalta's counterclaim, ECF No. 9-1, warrants dismissal of this claim.   Exhibit A is an Examiner's Amendment to CPA's trademark application for the mark "CPA 50E."   CPA argues that this document shows that CPA represented that the mark "CPA 50E" had no significance in the industry, rather than making any such claim of the mark "50E" alone, as Canalta alleges.   This distinction is of no consequence at this stage in the litigation.   Exhibit A is an amendment to an application; discovery in this case could reveal additional documentation of the alleged misrepresentations made to PTO, such as the original application and correspondence between CPA and PTO.   Canalta's citation to its Exhibit A does not render defective any of its factual allegations of fraudulent trademark procurement.

specific facts regarding the location of the alleged injury.[5]  Without such an allegation, CPA contends, Canalta's pleading fails to place CPA on notice of the claims against it because it is unclear which jurisdiction's laws apply after a choice of law analysis.  The Court finds this argument unpersuasive.

Canalta pleads sufficient factual allegations to support the reasonable inference that, if true, it is entitled to relief.  First, the counterclaim alleges both the content of the defamatory statements and the method by which they were made.  Canalta states that "CPA has contacted certain of Canalta's customers, both by phone and in writing, making false and slanderous allegations . . . that Canalta is using CPA's flow test data and that the Contour design is untested and unreliable . . . ."  Countercl. ¶ 34.  Canalta even attached a dated letter, signed by Mr. Sawchuk, that it alleges CPA sent to Canalta's customers.  Countercl. ¶ 34; Ex. B.  Canalta alleges that CPA made other defamatory statements to customers, including that Canalta fraudulently supplied "knock offs" and that Canalta is a company of "low integrity," countercl. ¶ 35, and that Canalta is going bankrupt, which is false, countercl. ¶ 36.  Second, Canalta alleged that CPA possessed the requisite mens rea required for defamation.  Finally, Canalta alleges an exact date when at least one of the defamatory statements was made (January 8, 2013), countercl. ¶ 34, and also alleges to whom the defamatory statements were made (Canalta's customers, and mutual customers of CPA and Canalta), countercl. ¶¶ 34-36.  Canalta also alleges where the statements were made (in this district).  Countercl. ¶ 37.  Given these allegations, the Court does not find credible CPA's assertion that Canalta fails to specify with particularity "the who, what, when and where" of this claim.  ECF No. 16 at 9.

---

[5] Mr. Sawchuk moves for dismissal of these claims against him on different grounds, which will be addressed in Part II.B of this memorandum opinion.

It is of no consequence to the Court's decision that Canalta may not have pleaded specific facts alleging which forum's law applies to its defamation claim.   As courts in this circuit and others have recognized, a choice-of-law analysis at the motion-to-dismiss stage is often premature. *See Banner Life Ins. Co. v. Bonney*, No. 2:11-cv-198, 2011 WL 6002609, at *5 (E.D. Va. Nov. 29, 2011) (citing *North Am. Tech. Svcs., Inc. v. V.J. Techs, Inc.*, No. 10-cv-1384, 2011 WL 4538069, at *2 (D. Conn. Sept. 29, 2011) ("Due to the complexity of this analysis when confronted with a choice of law issue at the motion to dismiss stage, courts . . . have concluded that it is more appropriate to address the issue at a later stage in the proceedings") and *Clean Earth of Maryland, Inc. v. Total Safety, Inc.*, No. 2:10-cv-l19, 2011 WL 1627995, at *2 (N.D. W. Va. Apr. 28, 2011)). *See also Snyder v. Farnam Companies, Inc.*, 792 F. Supp. 2d 712, 721 (D.N.J. 2011) (deferring choice of law inquiry at the motion to dismiss stage and applying law of the forum for purposes of determining whether the plaintiffs' claim satisfied Rule 12(b)(6)); *Cantonis v. Stryker Corp.*, No. 09-cv-3509, 2010 WL 1084971, at *3-4 (D. Minn. Nov. 23, 2010) (denying motion to dismiss and finding that a choice-of-law analysis would be premature until discovery is conducted, especially because discovery may reveal that there is no conflict of law between jurisdictions).

Therefore, the Court concludes that Canalta has satisfied the pleading standard and CPA's motion to dismiss Count V of the counterclaim is **DENIED**.

### 3.   Count VI: tortious interference

In Count VI of its counterclaims, Canalta charges CPA with tortious interference with prospective business relations.   Specifically, Canalta alleges that CPA interfered with the expectancy of Canalta's business relationships with: (1) clients; and (2) independent product-testing laboratories.   CPA argues that Count VI suffers from the same deficiency as Count V, with respect to choice-of-law allegations.   For the reasons discussed above, however,

the Court finds this argument unpersuasive, and will deny the motion to dismiss Claim VI on this ground.   As an additional ground for dismissal of Count VI, CPA argues that the counterclaim lacks factual allegations supporting the tortious interference claim as it relates to independent testing laboratories.

In West Virginia,[6] a plaintiff alleging tortious interference must show: (1) existence of a business relationship or expectancy thereof; (2) an intentional act of interference by a party outside that relationship or expectancy; (3) proof that the interference caused the harm sustained; and (4) damages.   Syl. Pt. 2, *Torbett v. Wheeling Dollar Sav. & Trust Co.*, 314 S.E.2d 166 (W. Va. 1983). With respect to Canalta's alleged business expectancy with certain clients, the counterclaim alleges sufficient facts to state a plausible claim for relief.   Canalta alleges that it has a business relationship, and an expectancy of such a relationship, with customers who purchase flow conditioners.   Countercl. ¶¶ 34-36.   Moreover, Canalta alleges that CPA contacted Canalta customers via written letter.   Countercl. ¶ 34; ECF No. 9-1.   Taking this allegation as true, as the Court must at this stage, Canalta has sufficiently pleaded a tortious interference claim.   CPA's act of contacting specific entities with this letter indicates that CPA itself believed that Canalta had an actual or expected business relationship with the letter recipients.   The letter is also an act that, as alleged, intentionally interferes with that relationship.   Canalta has plausibly alleged that as a result of this letter and other actions by CPA, Canalta has suffered lost sales and profits.   Because Canalta has stated a plausible claim for relief, the Court **DENIES** CPA's motion to dismiss Count VI as it relates to Canalta clients.

---

[6] CPA does not concede that West Virginia law applies to this particular claim.   The Court need not decide that question at this juncture; rather, West Virginia law is applied at this stage only for the purposes of deciding this motion to dismiss.

The Court, however, agrees with CPA that Canalta's allegations provide an insufficient basis to sustain a plausible tortious interference claim based on the independent testing laboratory. Unlike the allegations about CPA's interference with Canalta customers via a phone and letter campaign, there are no such factual allegations as to how CPA interfered with a relationship between Canalta and a testing laboratory. The only relevant factual allegation states: "On information and belief, CPA has wrongfully interfered with Canalta's attempts to retain independent laboratories to test its Contour products by the exercise of its market power." Countercl. ¶ 39. Without providing any additional allegations of CPA's actions or statements to an independent laboratory, the allegations have not stated a plausible claim for relief on this basis. *See Painter's Mill Grille, LLC v. Brown*, No. 12-1357, 2013 WL 2284874, at *10-11 (4th Cir. May 24, 2013) (affirming dismissal of tortious interference claims where there were no factual allegations regarding how the defendants effected the alleged interference). Accordingly, the Court **GRANTS in part** CPA's motion and dismisses Count VI of Canalta's Counterclaim, only to the extent that it asserts tortious interference of a business relationship with any testing laboratory. Canalta may proceed with Count VI based upon tortious interference of a business relationship with clients.

**B.      Defendant Sawchuk's Motion to Dismiss**

Counterclaim Defendant Sawchuk, a resident and citizen of Canada, appeared specially to move for dismissal of the counterclaims against him for lack of personal jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(2). Mr. Sawchuk argues that the Court lacks jurisdiction because he has insufficient contacts with West Virginia. For the reasons discussed below, the Court disagrees and finds that Canalta has established a *prima facie* case of jurisdiction to survive this motion to dismiss.

1.    **Legal standards**

When a defendant seeks dismissal of a claim for lack of personal jurisdiction, the plaintiff bears the burden to prove the grounds for jurisdiction by a preponderance of the evidence.   *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 60 (4th Cir. 1993).   An evidentiary hearing, however, is not required; where a district court "decides a pretrial personal jurisdiction dismissal motion without an evidentiary hearing, the plaintiff need prove only a prima facie case of personal jurisdiction." *Id.* (citing *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989)).   In deciding whether a plaintiff has proved a prima facie case of personal jurisdiction, the court must "draw all reasonable inferences arising from the proof, and resolve all factual disputes, in the plaintiff's favor."   *Id.* (citations omitted).   Of course, "[a] threshold *prima facie* finding that personal jurisdiction is proper does not finally settle the issue; plaintiff must eventually prove the existence of personal jurisdiction by a preponderance of the evidence, either at trial or at a pretrial evidentiary hearing." *New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 (4th Cir. 2005) (quoting *Prod. Grp. Int'l v. Goldman,* 337 F. Supp. 2d 788, 793 n.2 (E.D. Va. 2004) (citation omitted)).

A federal district court may only exercise personal jurisdiction over a nonresident defendant if: (1) such jurisdiction is authorized by the long-arm statute of the state in which it sits; and (2) the exercise of personal jurisdiction would be consistent with the Due Process Clause of the Fourteenth Amendment.   *See Consulting Engineers Corp. v. Geometric Ltd.*, 561 F.3d 273, 277 (4th Cir. 2009); *Mitrano v. Hawes*, 377 F.3d 402, 407 (4th Cir. 2004); *English & Smith v. Metzger*, 901 F.2d 36, 38 (4th Cir. 1990).   West Virginia's long-arm statute provides that West Virginia courts may exercise personal jurisdiction over nonresidents who engage in, *inter alia*:

(1) Transacting any business in this state;
(2) Contracting to supply services or things in this state;

17

\* \* \*

(4) Causing tortious injury in this state by an act or omission outside this state if he or she regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state.[7]

W. Va. Code § 56-3-33(a).   Because West Virginia's long-arm statute is co-extensive with the constitutional reach, the two inquiries merge into one—whether exercising personal jurisdiction over the defendant is consistent with the Due Process Clause.   *In re Celotex Corp.*, 124 F.3d 619, 627-28 (4th Cir. 1997).

The exercise of personal jurisdiction does not offend the Due Process Clause if the defendant has sufficient "minimum contacts" with the forum such that requiring the defendant to defend his interests there does not "offend traditional notions of fair play and substantial justice." *Id.* at 628 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citation omitted)). Even if a defendant lacks the quantity and nature of contacts with the state that would subject him to a court's general jurisdiction (that is, jurisdiction over the defendant for any cause of action), a court may nonetheless exercise specific jurisdiction over a defendant if the defendant's contacts with the forum provided the basis for the suit.   *See Mitrano*, 377 F.3d at 406-07; *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 397 (4th Cir. 2003).   In determining whether specific jurisdiction exists, a court should consider: (1) the extent to which the defendant has purposefully availed himself of the privilege of conducting activities in the state; (2) whether the plaintiff's claims arise out of those activities directed at the state; and (3) whether the exercise of

---

[7] Specifically, W. Va. Code § 56-3-33 names the Secretary of State as attorney-in-fact for a nonresident defendant who has committed one of the enumerated statutory acts.   The Secretary of State's acceptance of service is the legal equivalent of personally serving that nonresident in the state.   "By statutory design, compliance with the service of process procedures set forth in West Virginia Code § 56-3-33 expressly authorizes the exercise of personal jurisdiction over nonresident defendants by the courts of this state."   *Leslie Equip. Co. v. Wood Res. Co., LLC*, 687 S.E.2d 109, 115 (W. Va. 2009).

personal jurisdiction would be constitutionally reasonable. *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002). The Fourth Circuit explained this "reasonable" factor in *Base Metal Trading, Ltd. v. OJSC "Novokuznetsky Aluminum Factory"*, 283 F.3d 208 (4th Cir. 2002):

> Overall, courts "must consider the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief" when determining whether the exercise of jurisdiction is reasonable in any given case. *Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 113, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987). And "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *Id.* at 114, 107 S. Ct. 1026. But, "[w]hen minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." *Id.*

*Base Metal Trading*, 283 F.3d at 213-14.

With these standards in mind, the Court will now turn to the parties' arguments.

### 2.     Mr. Sawchuk's contacts with the forum

The parties agree that Mr. Sawchuk is a citizen and resident of Canada. Canalta argues, however, that this Court has specific personal jurisdiction over him, because Mr. Sawchuk signed a defamatory letter that was sent to actual or potential Canalta customers in West Virginia, and directed other oral defamatory statements to customers here. Because Canalta's claim against Mr. Sawchuk for defamation arises from Mr. Sawchuk's alleged contacts with the state, Canalta contends that personal jurisdiction exists in this case.

The Court finds it necessary to first address Mr. Sawchuk's argument that the counterclaim lacks sufficient factual allegations or proof tying him to the defamatory conduct directed towards West Virginia. The allegations supporting Canalta's counterclaim for defamation appear in paragraphs 34 through 38 and 59 through 64. Paragraph 34 alleges that "CPA has contacted certain of Canalta's customers, both by phone and in writing, making false and slanderous

19

allegations about Canalta."   Countercl. ¶ 34.   That same paragraph also states that "a true and correct copy of one such letter from CPA to its customers dated January 8, 2013, is attached as Exhibit 'B' hereto."   Countercl. ¶ 34.   Exhibit B is a letter, dated January 8, 2013, printed on CPA letterhead.   It is addressed "Dear Valued Customer" and states in part that Canalta "is marketing and selling counterfeit flow conditioners."   ECF No. 9-1.   The letter continues, stating that "Canalta falsely claims that the extensive test data generated for the CPA 50E flow conditioner is applicable to the CONTOUR 50 perforated plate" and "[Canalta] has used nomenclature for its perforated plate that is confusingly similar to CPA's registered trademarks."   Countercl. Ex. B, ECF No. 9-1.   The letter claims that the "CPA 50E test data is applicable ***only*** to the CPA 50E flow conditioner manufactured by CPA."   ECF No. 9-1.   The letter also notifies the customer that CPA "filed a lawsuit in the United States District Court for the Southern District of West Virginia to vindicate [its] rights."   ECF No. 9-1.   Finally, the letter purports to be signed by Dale Sawchuk, President.   ECF No. 9-1.

Paragraph 36 of the counterclaims alleges that CPA "falsely represented to its customers that Canalta is going bankrupt."   Countercl. ¶ 36.   The next paragraph states:

> On information and belief, one or more letters containing defamatory information as described in paragraph 36 hereof were signed by Defendant Sawchuk and sent to third parties in this District and/or Defendant Sawchuk made defamatory oral statements to third parties in this District, all which have damaged Canalta in this District.

Countercl. ¶ 37.   Mr. Sawchuk argues that paragraph 37 is the only factual allegation tying him to the defamation claim, and this paragraph alleges that Mr. Sawchuk signed letters containing defamatory information as described in paragraph 36 (alleging that CPA made false representations that Canalta is going bankrupt).   Mr. Sawchuk concludes that because Canalta has

20

produced no proof or evidence that he signed a letter making false representations that Canalta is *going bankrupt*, Canalta has not satisfied its burden of proving personal jurisdiction.

Mr. Sawchuk's argument appears to follow from a deliberately constrained reading of Canalta's counterclaims.   It is clear to the Court that paragraph 37's reference to paragraph 36 was a typographical error, and it should have referred instead to paragraph 34, which describes the content of the letter signed by Mr. Sawchuk.   This is plain from the surrounding allegations, and most importantly, the attachment of the letter signed by Mr. Sawchuk himself.   Under Mr. Sawchuk's reading of the counterclaims, the letter, signed by him, would serve to support the defamation claim against CPA but not the claim against Mr. Sawchuk himself.   That is not a reasonable construction of the counterclaims.   Therefore, the Court rejects Mr. Sawchuk's argument that the attached letter should not be considered as a factual allegation supporting the Court's personal jurisdiction over him.   Moreover, in an affidavit attached to his reply brief, Mr. Sawchuk denies only making oral and written statements alleging that Canalta was going bankrupt.   He does not deny in the affidavit that he signed the letter attached to the counterclaim, or that it was sent to customers in West Virginia, or that he made certain other defamatory statements to West Virginia customers, as alleged in the counterclaims.[8]   Sawchuk Aff., ECF No. 34-1.   Mr. Sawchuk's affidavit does nothing to controvert the relevant factual allegations supporting jurisdiction in the complaint, which the Court, in any event, must accept as true at this stage.

The Court now turns to the dispositive issue: whether Canalta has made a prima facie case of personal jurisdiction over Mr. Sawchuk.   First, the Court finds that Mr. Sawchuk has personally availed himself of the privilege of engaging in activities in West Virginia.   CPA's own

---

[8] It also appears to the Court that Mr. Sawchuk's signature on the affidavit matches the signature on the letter attached to the counterclaims.

complaint describes CPA as a "family owned business," compl. ¶ 7, and Mr. Sawchuk is the president of that business who benefits from the company's success and sales. CPA, with Mr. Sawchuk at its head, sells its flow conditioners to customers in West Virginia. Count V of CPA's own complaint charges Canalta with West Virginia common law claims of unfair competition and passing off, for damages that CPA allegedly suffered in lost sales in West Virginia. Compl. ¶¶ 67-71. Not only has the company availed itself of commercial opportunities in West Virginia, but it has also availed itself of the federal judicial resources located here by filing the initial complaint against Canalta in this district. The letter that was sent to CPA customers, signed by Mr. Sawchuk, explicitly refers to this litigation: "Once CPA learned of Canalta's activities, *we* filed a lawsuit in the United States District Court for the Southern District of West Virginia to vindicate *our* rights." ECF No. 9-1 (emphasis added). Therefore, the Court finds that Canalta's defamation claims arise from Mr. Sawchuk's contacts with West Virginia, because the allegedly defamatory letter was issued presumably to protect and promote the sales of CPA flow conditioners in West Virginia.

Finally, the Court finds that the exercise of jurisdiction over Mr. Sawchuk is constitutionally reasonable. Although Mr. Sawchuk is a foreign counterclaim defendant, there is no undue burden to requiring him to defend himself in this district, because it was his company that selected this district to file the initial suit. It certainly should not surprise Mr. Sawchuk to learn that he may be required to defend himself in this state, especially if the claims are closely related to—and were filed as a response to—his company's complaint. Additionally, Canalta, which also does business in this state, has an interest in pursuing its claim here, where it alleges its reputation was damaged and where it potentially lost sales. Mr. Sawchuk therefore has sufficient minimum contacts with West Virginia to support personal jurisdiction here. The burdens placed

on this alien defendant in defending himself in this forum are justified, especially where Mr. Sawchuk's company initially chose to file suit in West Virginia.   The Court concludes that it has personal jurisdiction over Mr. Sawchuk and **DENIES** his motion to dismiss.

### III.   CONCLUSION

For the reasons discussed above, the Court **GRANTS in part** and **DENIES in part** CPA's motion to dismiss.   CPA's motion to dismiss Count VI of the counterclaims is granted only to the extent that Count VI alleges a claim for relief based on tortious interference with independent testing laboratories.   Count VI of the counterclaims may proceed, however, as to the alleged tortious interference with Canalta clients.   CPA's motion to dismiss Counts II and V of the counterclaims is **DENIED**.   The Court also **DENIES** Mr. Sawchuk's motion to dismiss for lack of personal jurisdiction.   The Court finds that its exercise of personal jurisdiction over Mr. Sawchuk is proper.

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER:        June 25, 2013

ROBERT C. CHAMBERS, CHIEF JUDGE

23